Filed 12/15/25  In re M.P. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.P., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>M.P.,<br><br>    Defendant and Appellant. | E086422<br><br>(Super.Ct.No. J302143)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Jenie S. Chang, under appointment by the Court of Appeal, for Defendant and Appellant.

Laura Feingold, County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Plaintiff and Respondent.

1

## INTRODUCTION

In this dependency matter, Mercedes P. (Mother) filed a Welfare and Institutions Code[1] section 388 petition, seeking the return of her infant daughter M.P. with family maintenance services, or alternatively, family reunification services. The juvenile court summarily denied the petition. It then terminated Mother's parental rights following a contested section 366.26 hearing.

Mother appeals. She contends the juvenile court erred by denying her section 388 petition without holding an evidentiary hearing and by terminating her parental rights.

We affirm.

## BACKGROUND[2]

*Mother's Prior Dependency Proceedings*

Before M.P. was born, Mother had three other children removed from her care. A.U. (age 8) and M.A. (age 1) were removed from Mother in January 2020, following allegations of sexual abuse of A.U., physical abuse of M.A., domestic violence, and Mother's substance abuse. E.P., who was born in August 2020, was removed from Mother a few days after he was born, due to Mother's continued substance abuse and

---

[1] All further statutory references are to the Welfare and Institutions Code unless noted otherwise.

[2] Our procedural history does not address the efforts the San Bernardino County Children and Family Services (CFS) made to comply with the Indian Child Welfare Act of 1978 (ICWA) and related California law. (25 U.S.C. § 1901 et seq.; § 224 et seq.) However, we will note that CFS inquired of several relatives, both on the maternal and paternal sides, and the juvenile court ultimately found ICWA does not apply. Mother does not challenge the court's ICWA finding.

2

child welfare history. Mother was granted reunification services for all three children, but never successfully reunited with them and her reunification services were terminated. Mother's parental rights were terminated as to M.A. and E.P. in April 2022. A.U. was placed with her father, and her dependency proceeding was dismissed in February 2022.

*The Current Investigation and Detention*

On September 6, 2024—the day after M.P. was born—CFS received a referral alleging general neglect based on Mother's history of drug use while pregnant with M.P. Mother was reported to have tested positive for methamphetamine and amphetamine at a prenatal appointment in February 2024, and to have disclosed that despite knowing she was pregnant, she continued to use methamphetamine daily and to drink alcohol every weekend, until around May 2024 when she quit "cold turkey." It was also reported that M.P.'s father was not involved.

CFS initiated an investigation. Mother confirmed that M.P.'s father was not involved. M.P.'s father was a man named Oliver. Mother did not know Oliver's last name, and she no longer had his contact information. The last time Mother spoke with Oliver was a few months before M.P. was born.

As to her substance use, Mother told the social worker that she started using methamphetamine in 2017. She initially stopped in 2020 but began using again in 2022 after her parental rights were terminated to two of her other children. By January 2024, when Mother found out she was pregnant with M.P., she was using methamphetamine on a daily basis. Mother reported that she stopped drinking alcohol in January 2024 due to a kidney infection, but she continued to use methamphetamine daily until March 2024.

She then reduced her use "to about one to two times per week" until she was able to quit in May 2024. Mother also used cocaine on at least one occasion while she was pregnant with M.P.

Mother and M.P. both tested negative for substances when M.P. was born. A week later, on September 12, 2024, Mother tested positive for opiates. CFS obtained a detention warrant the next day. M.P. was still in the hospital at the time, with an unknown discharge date. M.P. had been admitted to the neonatal intensive care unit after she was born due to her low blood sugar and difficulty feeding. M.P. was born with hypoglycemia, which is common for a child born to a diabetic mother.

On September 17, 2024, CFS filed a dependency petition with allegations under section 300, subdivisions (b)(1), (g), and (j). The petition alleged that Mother had an on-going substance abuse problem (b-1), that the father's whereabouts and ability to provide care and support to M.P. were unknown (b-2 & g-3), and that three of M.P.'s half-siblings had previously been removed from Mother due to concerns of abuse and/or neglect, thus placing M.P. at a similar risk of harm (j-4).

On September 18, 2024, the juvenile court ordered M.P. detained. The court authorized supervised visitation on a weekly basis and ordered predisposition services for Mother.

*Jurisdiction and Disposition*

In October 2024, Mother provided the social worker with documentation that she had enrolled in parenting classes, therapy, and an outpatient substance abuse program. Mother also provided a medical record that showed she had been prescribed

4

hydrocodone-acetaminophen for pain at a "post C-section" medical appointment on September 10, 2024. Mother told the social worker that the reason she tested positive for opiates on September 12 was because she took the medication as prescribed.

Mother took two drug tests in October 2024—one was negative, and one was positive for ethanol. Also in October, Mother began her supervised visits with M.P. CFS did not note any concerns with Mother's visits throughout the month of October.

At the combined jurisdiction and disposition hearing on October 28, 2024, Mother's counsel requested the b-1 allegation be amended to proof. Counsel argued that Mother had been sober for about six months, and there was an explanation for her positive drug and alcohol tests—the positive drug test was due to Mother's prescribed medication, and the positive ethanol test was because Mother was diabetic. The court noted there had not been any evidence that the positive ethanol test was the result of Mother being diabetic, but it otherwise granted Mother's request. The court amended the b-1 allegation to allege that Mother has a history of substance abuse and a current alcohol problem which negatively impacts her ability to provide for and protect the child. As amended, the court sustained the b-1 allegation. It sustained the remaining allegations as written.

As to disposition, the court heard testimony from Mother that about three weeks earlier, she had enrolled in an outpatient substance abuse program, individual counseling and a parenting program. Mother acknowledged that she used methamphetamine for the first five months of her pregnancy, but maintained she had not used any illegal substances since May 20, 2024, and she had not consumed any alcohol since January 2024. Mother

5

also acknowledged that she did not successfully complete drug and alcohol programming in the prior dependency proceedings. Mother attended two substance abuse programs during the course of prior proceedings. She completed the first program in 2020, and then started a second program, which she did not complete. She dropped out with only a few sessions remaining, and then relapsed in 2022.

After hearing Mother's testimony and argument from counsel, the juvenile court followed the recommendation to bypass Mother's reunification services under section 361.5, subdivision (b)(10) and (b)(11). The court found Mother's reunification services and parental rights had previously been terminated as to M.P.'s half-siblings, and Mother had not subsequently made a reasonable effort to treat the problems that led to removal. The court focused primarily on Mother's substance abuse issue, noting "that the same issue involving the history of substance-abuse is a reoccurring theme regarding [Mother] and her children."

The court also found that Oliver, last name unknown, was the alleged father and was not entitled to reunification services.

The court initially set the section 366.26 hearing for February 2025, but it was later continued to June 26, 2025.

*Mother's Section 388 Petition*

On June 26, 2025, Mother filed a section 388 petition seeking the return of M.P. with family maintenance services, or alternatively, family reunification services. Mother's petition alleged she had been clean for the past seven months, since November 30, 2024; she had completed parenting and domestic violence awareness

6

programs; and she was enrolled in an outpatient substance abuse treatment program, with a possible graduation date of July 31, 2025. The petition further alleged that Mother had been consistently visiting M.P. since the inception of the case, and it would be in M.P.'s best interest to have her biological mother raise her. In support of her allegations, Mother attached a progress report from the substance abuse treatment program and certificates that showed she had completed a 20-week domestic violence awareness program and a 16-session parental education program.

The juvenile court summarily denied Mother's petition without holding a hearing. The court concluded the petition did not state new evidence or a change of circumstances, nor was the proposed change in M.P.'s best interest. The court noted Mother had "a lengthy history of substance abuse issues" and that the documentation she provided stated she had a "'possible graduation date [of] July 31, 2025'" from the substance abuse program. The court found Mother had only demonstrated "changing" circumstances.

*The Section 366.26 Report and Hearing*

CFS filed the section 366.26 report on June 13, 2025. By that time, M.P.'s alleged father Oliver V. had appeared in court, and a court-ordered paternity test established that he was M.P.'s biological father.

The section 366.26 report recommended the court terminate the parents' parental rights and order a permanent plan of adoption. M.P. was nine months old when the report was filed and did not have any medical, developmental, or emotional issues that would prevent her adoption. She was crawling, pulling herself up, and able to stand with

7

assistance.  The only identified need was for occupational therapy "to address some shakiness when she reaches for things."

The report stated M.P. had been living with her current caregivers, the maternal uncle and his wife, for the past six months, since December 19, 2024.  M.P. "appear[ed] to be happy, well taken care of" and had demonstrated "a positive attachment with the caregivers."  The caregivers were also reported to have "developed a mutual attachment" with M.P.  The caregivers wanted to adopt M.P. and were committed to raising her to adulthood.  They were willing to maintain a relationship with Mother, provided there were "boundaries and rules."  They were less willing to maintain a relationship with M.P.'s father.  The maternal uncle felt M.P.'s father, "'should have stepped up … [and] provided for her.'"

The report also stated that Mother has been consistent in visiting M.P., and that the visits have been positive, with no concerns noted.  The social worker described Mother bringing age-appropriate toys to the visits and encouraging M.P. to crawl.  When M.P. would get fussy, Mother would "gently rock[] and sway[] [M.P.] to calm her down."  The social worker noted that during the initial exchange from the caregiver to Mother, M.P. "does not cry and appears to be happy during the exchange."  However, at the end of the visits, M.P. "has been observed to reach her arms out to the caregiver."

The contested section 366.26 hearing was held on June 26, 2025.[3]  Mother testified that she has been consistently visiting M.P. since the beginning of the case and

---

[3] The clerk's transcript identifies the date of the hearing as June 26, 2025.  The reporter's transcript identifies the date of the hearing as June 25, 2025.

8

has not missed any visits. Mother brings toys with her to the visits and a blanket for the floor. Mother said she feeds M.P., changes her, talks to her, soothes her, and sings and dances with her. Mother also said that when M.P. sees Mother, she smiles. M.P. taps Mother and puts her head on Mother's chest. When the visits end, M.P. looks back at Mother and throws her arms at Mother.

Following Mother's testimony, CFS and M.P.'s counsel requested the court terminate parental rights and set a permanent plan of adoption. Both parents requested legal guardianship. Mother argued that she met the parental-benefit exception to adoption, as set forth in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*).

Having considered the evidence, the court found M.P. was both generally and specifically adoptable. It also found that most of Mother's testimony was consistent with the section 366.26 report; although one discrepancy the court noted was at the end of the visits the social worker reported M.P. had been observed reaching her arms out to the caregiver.

The court found Mother met the first element of the parental-benefit exception because she maintained regular visitation and contact with M.P., but she did not meet the second or third elements of the exception. As to those elements, the court found that M.P. was less than a year old and was only in Mother's custody for a brief period of time. The court explained that when such a young child has never lived in the parent's care, the law requires the parent to "show more than positive supervised visits to trigger the exception." "There must also be evidence that the child will suffer detriment if the parent/child relationship is severed." The court found, "[t]here has been no evidence

presented that there is a relationship between [M]other and [M.P.] that … would benefit [M.P.] to such a degree that termination of parental rights would be detrimental to [M.P.]." Having so found, the court terminated both parents' parental rights.

Mother timely filed a notice of appeal.

## DISCUSSION

A. *Section 388 Petition*

Mother contends the juvenile court abused its discretion and violated her due process rights by summarily denying her section 388 petition without holding an evidentiary hearing. Mother asserts the error cannot be deemed harmless because her petition stated a prima facie case for relief. As we explain, we disagree.

Section 388 allows a parent, "upon grounds of change of circumstance or new evidence" to petition the juvenile court "for a hearing to change, modify, or set aside any order of court previously made." (§ 388, subd. (a)(1).) "If it appears that the best interests of the child … may be promoted by the proposed change of order, … the court shall order that a hearing be held." (§ 388, subd. (d).)

Section 388 petitions are to be liberally construed in favor of granting a hearing. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309; Cal. Rules of Court, rule 5.570(a).) However, to obtain "a full hearing" on a section 388 petition, the parent must make a prima facie showing of their entitlement to relief. (*In re Marilyn H.*, *supra*, at p. 310.) This is done by alleging facts, that "if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*In re J.P.* (2014) 229 Cal.App.4th 108, 127.)

10

"There are two parts to the prima facie showing:  The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children."  (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)  The parent must make a prima facie showing on both elements to trigger an evidentiary hearing on the petition.  (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)  "It is not enough for a parent to show *just* a genuine change of circumstances under the statute.  The parent must show that the undoing of the prior order would be in the best interests of the child."  (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529.)  "If the liberally construed allegations of the petition do not show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing."  (*In re Anthony W.*, *supra*, at p. 250; Cal. Rules of Court, rule 5.570(d)(1).)  In this respect, section 388 "provides a means for the court to address a legitimate change in circumstances while protecting the child's need for prompt resolution of his [or her] custody status."  (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 309.)

In assessing whether a petition has made a prima facie showing, the juvenile court may consider the entire factual and procedural history of the case.  (*In re J.P.*, *supra*, 229 Cal.App.4th at p. 127.)  Not every change in circumstance or new evidence will justify modification of a prior order.  (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.)  The change in circumstance or new evidence "must relate to the purpose of the order and be such that the modification of the prior order is appropriate.  [Citation.]  In other words, the problem that initially brought the child within the dependency system must be removed or

11

ameliorated." (*Ibid.*; *In re Angel B.* (2002) 97 Cal.App.4th 454, 463–464.) It is not enough for the parent to show that their circumstances are changing; a parent petitioning for a hearing under section 388 "must show *changed*, not changing, circumstances." (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.)

If the liberally construed allegations of the petition do not state a prima facie case for relief, summarily denying the petition without holding a hearing does not violate the parent's due process rights. (*In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1413–1414.)

We review the summary denial of a section 388 petition for abuse of discretion. (*In re A.S.* (2009) 180 Cal.App.4th 351, 358.) "Under this standard of review, we will not disturb the decision of the trial court unless the trial court exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination." (*Ibid.*)

Mother's section 388 petition alleged she had been clean for seven months, since November 30, 2024; she had completed parenting and domestic violence awareness programs; and she was enrolled in an outpatient drug treatment program with a possible graduation date of July 31, 2025. In support of these allegations, Mother provided certificates of completion from the parenting and domestic violence awareness programs, and a progress report from the substance abuse program. The progress report reflected that despite Mother having made "good" and "excellent" progress in the program, she tested positive in drug/alcohol screening tests on April 23, and May 15, 2025; and that even though Mother had provided the substance abuse program with a letter from her doctor that stated her positive tests for alcohol were due to uncontrolled diabetes, the

12

clinician at the program still believed Mother "would benefit from continuing treatment."[4]

The record also reflects that this was the third substance abuse program Mother had attended over the course of her eight-year addiction. Mother completed the first program in 2020, and then started a second program, which she did not complete. She dropped out of the second program with only a few sessions remaining and began using drugs again. By the time Mother found out she was pregnant with M.P. in January 2024, she was using methamphetamine on a daily basis and continued to use it at least once or twice a week for the first five months of her pregnancy. Mother's inability to address her substance abuse issues after having lost physical custody of one of her children and having her parental rights terminated as to two of her other children, was the primary reason the court identified in bypassing Mother's reunification services.

On this record, we cannot say the juvenile court abused its discretion in concluding that Mother had "only demonstrated changing circumstances." Even when liberally construed, Mother's section 388 petition alleged she had only been clean for seven months, since November 30, 2024, and had not yet completed the substance abuse program in which she was enrolled. Seven months of sobriety, while not insignificant, was only a brief period of time compared to Mother's eight-year struggle with addiction, and Mother had a history of both having quit a substance abuse program with only a few

---

[4] Mother did not attach the letter from her doctor as an exhibit to the petition, nor did the progress report indicate what substance Mother tested positive for on April 23 and May 15, 2025.

sessions remaining and having relapsed after completing a program. (See *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423 ["seven months of sobriety since [the father's last] relapse … while commendable, was nothing new"]; *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 [the father's "recent sobriety reflects 'changing,' not changed, circumstances"].)

Mother acknowledges that she was still "in the process of completing her outpatient substance abuse program," but contends she made a prima facie showing on her petition based on the presentation of new evidence—her completion of the parenting and domestic violence awareness programs. Mother completed these programs after the disposition hearing, and asserts that because the juvenile court had before it "material new evidence of Mother completing reunification programs" it should have ordered an evidentiary hearing on the petition.

We are not persuaded. When a parent's section 388 petition contains allegations of new evidence or changed circumstances, along with an allegation that "fatally undermine[s]" the petition, the juvenile court is not required to hold an evidentiary hearing. (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593.) Here, although Mother's petition contained allegations of new evidence—her completion of the parenting and domestic violence awareness programs—it also included allegations that she had only been clean for seven months and only had a "possible" graduation date from the substance abuse program in which she was enrolled. This fatally undermined Mother's petition because it showed she was still in the process of addressing her substance abuse issue, which was the juvenile court's primary concern. (See *In re Angel B.*, *supra*, 97

14

Cal.App.4th at p. 463, see *id.* at p. 462 [the "simple completion of … classes taken by the [parent] … does not, in and of itself, show prima facie that either the requested modification or a hearing would be in the minor's best interests"]; see also, *In re Amber M.* (2002) 103 Cal.App.4th 681, 686 [no abuse of discretion in denying § 388 petition where mother completed domestic violence and sexual abuse treatment programs but only established a 372-day period of sobriety].)

In sum, to make a prima facie showing of entitlement to an evidentiary hearing on her petition, Mother needed to show that the facts she alleged, if credited at the hearing, would support granting the petition. (*In re J.P.*, *supra*, 229 Cal.App.4th at p. 127.) Mother did not make that showing because even when liberally construed, the facts alleged in Mother's petition showed only that Mother's circumstances were changing, not that they had changed. A petition which alleges "merely changing circumstances" and would require delaying the section 366.26 hearing to see if a parent, who has "failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47, overruled on other grounds in *Caden C.*, *supra*, 11 Cal.5th at p. 636, fn. 5.)

Accordingly, because Mother did not make a prima facie showing of entitlement to relief on her section 388 petition, the juvenile court did not abuse its discretion or violate Mother's due process rights by summarily denying the petition without holding an evidentiary hearing.

15

## B. *Termination of Parental Rights*

Mother also contends the juvenile court erred in terminating her parental rights. Mother asserts she satisfied the parental-benefit exception to adoption. We disagree.

The purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed. (*In re J.D.* (2021) 70 Cal.App.5th 833, 851–852.) "'[T]he court may select one of three alternative permanency plans for the dependent child—adoption, guardianship or long-term foster care.'" "[A]doption is preferred because it ensures permanency and stability for the minors." (*In re A.S.* (2018) 28 Cal.App.5th 131, 152; see § 366.26, subd. (b)(1).) "'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.] 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.'" (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) "Thus, as a general rule, at a section 366.26 hearing, if the trial court finds that the child is adoptable, it must select adoption as the permanent plan and terminate parental rights. (§ 366.26, subds. (b)(1) & (c)(1).)" (*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 206.)

At the section 366.26 hearing, "the court presumes that terminating parental rights is in the child's best interests, and the party opposing that result must demonstrate a 'compelling reason for determining that termination would be detrimental to the child' due to one of [the] six enumerated reasons" set forth in section 366.26, subdivision (c)(1)(B). (*In re A.S.*, *supra*, 28 Cal.App.5th at p. 152.) These statutory exceptions

16

"permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53.)

The statutory exception at issue here is the parental-benefit exception. This exception applies if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) To satisfy this exception, the parent must establish three elements by a preponderance of the evidence: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 631, 636–637.)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) "To satisfy this element, parents 'must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits' [citations], they must establish a substantial, positive, emotional attachment between them and the child." (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 816.) "[T]he kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, at p. 636.) In assessing this element, the focus is on the child. (*Id*. at p. 632.) The court considers such factors as the child's age

17

and particular needs, the length of time the child has spent in parental custody, and the positive and negative effects of interactions between parent and child, as well as how the child speaks about, interacts with, or feels about the parent.  (*Ibid*.)

As to the final element, whether the termination of parental rights would be detrimental to the child, the juvenile court "must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home."  (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  The court must ask, "does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]'  [Citation.]  When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child due to' the child's beneficial relationship with a parent."  (*Id*. at pp. 633–634, italics omitted.)

We review the juvenile court's ruling on whether the parental-benefit exception applies using a hybrid approach.  We apply the substantial evidence standard of review to the first two elements, and the abuse of discretion standard to the third element.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–641.)  In applying the substantial evidence standard of review, "we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order."  (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)  In applying the abuse of discretion standard of review, "we determine whether the juvenile court's decision exceeded the

bounds of reason and, in so doing, we cannot substitute our view for that of the juvenile court." (*In re I.E.* (2023) 91 Cal.App.5th 683, 691.)

At issue here are the second and third elements of the parental-benefit exception, whether Mother demonstrated that she shared such a substantial, positive and emotional attachment with M.P., that the harm of severing the parent-child relationship outweighed the benefit of stability in adoption. (*Caden C.*, *supra*, 11 Cal.5th at pp. 633, 636.)

In assessing this issue, we considered the case of *In re Angel B.*, *supra*, 97 Cal.App.4th 454. Much like the present case, the mother in *In re Angel B.* had a history of struggling with drug addiction, and despite her parental rights having been terminated as to an older sibling, the mother continued to use drugs while pregnant with Angel. (*Id*. at p. 459.) Angel was detained from the hospital soon after she was born and never lived with the mother. At the disposition hearing, the juvenile court bypassed the mother's reunification services. (*Ibid*.) By the time of the section 366.26 hearing, Angel was just over a year old, and the mother was doing better. (*Id*. at pp. 458–459.) She had enrolled in a residential drug treatment program, completed various classes, and had been testing clean for four months. She was also consistently visiting Angel, and the visits were going well. (*Id*. at p. 459.) However, despite the progress, the juvenile court denied the mother's section 388 petition and terminated her parental rights. (*Ibid*.)

In affirming the termination of parental rights, the court employed reasoning which is applicable here. The court "note[d] that (1) Angel is very young, too young to understand the concept of a biological parent; (2) she has spent relatively few hours visiting with Mother, versus many hours being parented by the foster family; (3) Mother

and Angel's interactions have been positive, but nothing in the record indicates that, from Angel's point of view, the interactions were particularly like those of a child with her mother; and (4) there is no evidence that Angel has any particular needs that can be met by Mother but not by the foster family." (*In re Angel B.*, *supra*, 97 Cal.App.4th at pp. 467–468.)  The court went on to conclude that "there was no hint in the record before the juvenile court that Angel would be harmed in any way if her relatively brief, albeit happy, visits with Mother were to end." (*Id*. at p. 468.)

The same reasoning applies here.  M.P. was only nine months old at the time of the section 366.26 hearing.  She had never lived with Mother and had spent over half of her young life with the current caregivers.  In that time, M.P. had developed "a positive attachment" to the caregivers, and "appear[ed] to be happy, [and] well taken care of."  By all accounts, Mother was affectionate with M.P. and attentive to her needs during the visits, but the record does not reveal any particular need of M.P.'s that can be met uniquely by Mother.  There was also no indication that M.P. cried or otherwise exhibited distress at the end of the visits.  To the contrary, the social worker reported that at the end of the visits M.P. would "reach her arms out to the caregiver."

"There is no question that there are benefits in continued visits with loving parents to which the child has some substantial attachment." (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 820.)  However, "[a] "'showing [that] the child would derive *some* benefit from continuing a relationship maintained during periods of visitation'" is not a sufficient ground to depart from the statutory preference for adoption." (*Id*. at p. 818.)  It is only "[w]hen the relationship with a parent is so important to the child that the security

20

and stability of a new home wouldn't outweigh its loss" that termination of parental rights would be detrimental to the child.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 633–634.)

On this record, given M.P.'s young age, the limited time she spent with Mother, and the social worker's report that M.P. had developed "a positive attachment" to the caregivers and would reach her arms out to the caregiver at the end of visits, the juvenile court could reasonably conclude that Mother did not establish that her relationship with M.P. was so positive and substantial that it outweighed the benefits M.P. would receive from a permanent, adoptive home with her current caregivers.

Accordingly, the juvenile court did not err in concluding the parental-benefit exception to adoption did not apply in this case.

## DISPOSITION

The orders entered by the juvenile court on June 26, 2025, denying Mother's section 388 petition and terminating her parental rights are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ_____
P. J.


We concur:

CODRINGTON_____
J.
FIELDS_____
J.

21